UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

**NAFTALI KUNSTLINGER as Trustee of THE PINCHAS STOLPER INS TRUST 3/06/08,**

   Plaintiff,

   v.

**LINCOLN BENEFIT LIFE COMPANY,**

   Defendant.

Case No. 22–04534–ESK–AMD

OPINION

**KIEL, U.S.D.J.**

   **THIS MATTER** is before the Court on plaintiff Naftali Kunstlinger as trustee of the Pinchas Stolper Insurance Trust 3/06/08 (the Trust) and defendant Lincoln Benefit Life Company's (Lincoln) competing motions for summary judgment. (ECF No. 32, ECF No. 33.) The parties have filed corresponding oppositions (ECF No. 34 (Kunstlinger Opp'n Br.), ECF No. 35 (Lincoln Opp'n Br.)) and replies (ECF No. 36 (Kunstlinger Reply Br.), ECF No. 37). For the following reasons, Kunstlinger's motion will be DENIED and Lincoln's motion will be GRANTED.

   **I.   BACKGROUND AND PROCEDURAL HISTORY**

   On July 15, 2008, Lincoln issued a flexible premium adjustable life insurance policy insuring Phineas Stolper. (ECF No. 33–4 (Policy) p. 6.) The policy's face value was $7.5 million, and its primary beneficiary was the Trust. (*Id.* pp. 6, 36.)  Kunstlinger is the trustee of the Trust. (ECF No. 32–7 (Kunstlinger Aff.) p. 1.)

   The policy's monthly activity day was the fifteenth of each month. (Policy p. 6.)  Payments were flexible, meaning that the amount of, or time between,

payments could be changed. (*Id.* p. 21.) The amounts paid were reflected in the policy's certificate value with insufficient payments leading to "lapse subject to the grace period." (*Id.*) The certificate value represented "accumulation with interest of premiums paid less charges and withdrawals." (*Id.* p. 22.) The certificate value on a given monthly activity day was the previous month's certificate value minus the monthly deduction and any partial withdrawals with interest and plus one month's interest and any net premiums received since the previous monthly activity day with interest. (*Id.*) Monthly deductions included the monthly certificate fee, monthly administrative expense charge, monthly cost of insurance, and monthly cost of any riders. (*Id.* p. 23.) The policy's surrender value represented the amount to be paid upon a request to terminate the certificate and was calculated by taking the certificate value and subtracting the surrender charge and any certificate debt. (*Id.*) Surrender charge percentages for each year were set out in a table. (*Id.* p. 12.)

A minimum initial payment of $239,946 was to be made followed by planned annual payments of $364,971. (*Id.* p. 6.) Premium expense charges of five percent applied to premiums paid during the first 20 years of the policy. (*Id.* p. 8.) The policy stated that "[t]he payment of a monthly Safety Net premium of $19,995.50, on or before each monthly activity day, is guaranteed to keep this certificate in force for 5 years, assuming no loans or withdrawals are taken." (*Id.* p. 6.) Relevant to the instant motions, the policy further stated that, except as provided in a safety net premium provision,

> if on any monthly activity day the net surrender value is less than the monthly deduction for the current certificate month, you will be given a grace period of 61 days. This certificate will be in force during the grace period. If you do not make sufficient payment by the end of the grace period, the certificate will lapse.…
> We will send a written notice to the most recent address we have for you at least 30 days prior to the day coverage lapses.

2

(*Id.* p. 21.)

The Trust made an initial payment of $364,971 on July 28, 2008 followed by payments of $55,000, $59,922, and $179,985.50 on November 20, 2009, June 15, 2010, and September 14, 2010, respectively  (ECF No. 33–5 (Premium History Log) p. 5.)  Beginning in April 2011 and continuing until May 2021, the Trust made monthly payments of $19,995.50 or, more often, $19,996.50.  (*Id.* pp. 2–5.)  An annual statement for the period of July 15, 2019 to July 15, 2020, dated July 15, 2020, stated that "ASSUMING PLANNED PERIODIC PREMIUMS ARE PAID AS SCHEDULED, GUARANTEED INTEREST AND GUARANTEED COST OF INSURANCE RATES ARE DEDUCTED, THE POLICY'S NET CASH SURRENDER VALUE WILL NOT MAINTAIN INSURANCE IN FORCE UNTIL THE END OF THE NEXT REPORTING PERIOD UNLESS FURTHER PREMIUM PAYMENTS ARE MADE."  (ECF No. 33–6 p. 58.)

On December 15, 2020, Lincoln sent a notice to the Trust indicating that the policy had entered into grace on that same day and that the policy was in danger of terminating at the end of the 61-day grace period.  (ECF No. 33–8 p. 2.)  The notice requested a minimum payment of $116,841.94 by February 14, 2021.  (*Id.*)  The notice further advised that without sufficient premium payments, the policy would enter into grace again and that, if planned periodic premiums were being made, they were insufficient in amount or frequency to keep coverage in force.  (*Id.*)  The Trust was encouraged to review the terms of the policy and policy statements to determine if and when an adjustment in billing was necessary.  (*Id.*)

Kunstlinger called Lincoln's insurance services on February 8, 2021 to inquire about the December 15, 2020 grace notice.  (ECF No. 33–9 (Feb. 8, 2021 Call Tr.) p. 3.)  The Lincoln representative advised that the surrender charge was why the policy was "tripped" and that "if the surrender value is at

3

zero, even though you have a—an accumulated value, you would still have to heed that grace notice." (*Id.* p. 5.) The representative stated that the policy was no longer in grace because Lincoln had received two payments since the notice had gone out and that he would request an illustration so that Kunstlinger could "know what that minimum premium would need to be to keep it active so that this doesn't happen again." (*Id.*) The representative confirmed that "as of now" the policy was active and Kunstlinger did not have to worry about the policy being terminated. (*Id.*)

An illustration was prepared for the Trust on February 9, 2021. (ECF No. 33–10 (Feb. 9, 2021 Illustration).) The illustration stated that the policy's current net surrender value was $627.97 and proposed a lump payment of $206,000 in addition to a revised annual premium payment of $721,269.26, up from $364,971. (*Id.* pp. 4, 5.)

A second grace notice was issued on February 16, 2021, seeking a minimum payment of $152,771.51 by April 18, 2021. (ECF No. 33–11 (Feb. 16, 2021 Grace Notice) p. 2.) A third grace notice was sent on March 15, 2021, seeking a minimum payment of $150,657.27 by May 15, 2021. (ECF No. 33–12 (Mar. 15, 2021 Grace Notice) p. 2.)

On May 17, 2021, Lincoln wrote to the Trust stating that the grace period had expired and that the policy had lapsed with all value and benefits forfeited. (ECF No. 33–16 p. 2.) Kunstlinger called Lincoln customer services on May 24, 2021 and inquired about the policy's lapse. (ECF No. 33–17 p. 3.) The representative stated that, while the Trust was making payments of $19,996.50, the monthly cost of the insurance was more than $36,000 and that the policy lapsed after the expiration of the grace notice sent on March 15, 2021. (*Id.* p. 4.) In response to Kunstlinger's question about sending a minimum payment at the time of the call, the representative advised that such payment

4

would be returned as the policy had lapsed and that his recourse was to complete an application for reinstatement of the policy. (*Id.* p. 5.)

On May 26, 2022, following Stolper's death, Kunstlinger filed a claim to collect the policy's death benefit. (Kunstlinger Aff. p. 3.) Lincoln refused to pay the benefit, claiming that the policy lapsed. (*Id.*)

Kunstlinger, as trustee of the Trust, filed suit in New Jersey Superior Court—Ocean County on June 2, 2022, claiming that Lincoln failed to account for premium payments in accordance with the policy's terms, failed to send proper grace notices, and was estopped from claiming that the policy entered into grace and terminating the policy based on the representative's statements during the February 8, 2021 call. (ECF No. 1–2 (Kunstlinger Compl.) pp. 5–10.)[1] Lincoln removed the case to this District on the basis of diversity. (ECF No. 1.) Lincoln filed its answer on August 18, 2022. (ECF No. 5.) As later amended, Lincoln's answer asserted counterclaims seeking declaratory judgment that the policy was an illegal wagering contract and that the policy "lacked insurable interest because it was procured by and for the benefit of strangers without an insurable interest under New Jersey law." (ECF No. 12 pp. 11–18.)[2] District Judge Georgette Castner denied Kunstlinger's motion to dismiss Lincoln's amended counterclaims. (ECF No. 23, ECF No. 24.)

The pending motions, both filed on March 1, 2024, followed. (ECF No. 32, ECF No. 33.) After the motions were briefed, this case was reassigned to me. (ECF No. 38.)

---

[1] Kunstlinger's call with the Lincoln representative is said to have occurred on February 9, 2021 in Kunstlinger's complaint, brief, and statement of material facts in support of his motion. (Kunstlinger Compl., ECF No. 32-1 (Kunstlinger Mot. Br.), ECF No. 32–2.) The Court presumes that these are typographical errors and will assume that references to the February 8, 2021 call were intended.

[2] These counterclaims are not at issue in the pending motions.

## II. STANDARD AND PARTY ARGUMENTS

### A. <u>Motions for Summary Judgment</u>

The Federal Rules of Civil Procedure dictate that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine when "the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party'" and a fact is "'material' if it 'might affect the outcome of the suit under the governing law.'" *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Facts and evidence are to be viewed in the light most favorable to the nonmovant. *Id.*

### B. <u>Party Arguments</u>

The parties' briefing in support of their own motions and in opposition to their adversary's repeat similar arguments. The crux of their dispute is Lincoln's position that the policy terminated prior to Stolper's death and thus no death benefit was payable, while Kunstlinger asserts two reasons for the Court to invalidate that termination—both of which Lincoln asks the Court to reject.

Kunstlinger first argues that the March 15, 2021 grace notice was invalid. (Kunstlinger Mot. Br. pp. 11–14, Kunstlinger Opp'n Br. pp. 16–21.) Under New Jersey law,[3] cancellation notices must be made in strict compliance with statutes and regulations, according to Kunstlinger. (Kunstlinger Mot. Br. p. 12.) While New Jersey statutes do not themselves state how much an insurance company may demand, other states have found that a valid cancellation notice must request no more than is necessary to prevent a policy from lapsing. (*Id.*, Kunstlinger Opp'n Br. pp. 19, 20.) Here, the March 15,

---

[3] The parties do not dispute that New Jersey law applies.

6

2021 grace notice sought an amount significantly greater than what was necessary to keep the policy in force, thus the grace notice and termination are void, according to Kunstlinger. (Kunstlinger Mot. Br. pp. 13, 14, Kunstlinger Opp'n Br. pp. 20, 21.) In his opposition brief to Lincoln's motion, Kunstlinger posits that Lincoln long miscalculated the surrender values of the policy, raising questions about Lincoln's calculations and whether the policy entered into grace on March 15, 2021. (Kunstlinger Opp'n Br. pp. 21, 22.)

Alternatively, Kunstlinger claims that Lincoln is equitably estopped from terminating the policy. (*Id.* pp. 13–16, Kunstlinger Mot. Br. pp. 14, 15.) Equitable estoppel prohibits a party from repudiating on a prior position that another party relied on to their detriment and equitable estoppel is expanded in insurance matters to protect the insured's reasonable expectations. (Kunstlinger Mot. Br. p. 14, Kunstlinger Opp'n Br. pp. 15, 16.) Kunstlinger asserts that he was informed during the February 8, 2021 phone call with the Lincoln representative that the policy was in force and not in danger of termination. (Kunstlinger Mot. Br. p. 14, Kunstlinger Opp'n Br. pp. 14, 15.) "In other words, Lincoln advised [Kunstlinger] that the $19,996.50 monthly premium payment—the amount that [Kunstlinger] has been paying all along—was sufficient in order to continue to keep the Policy in force." (Kunstlinger Mot. Br. p. 15.) Based on that representation, Kunstlinger claims that he continued to pay $19,996.50 premiums and thus, even if the amount stated on the March 15, 2021 grace notice was correct, Lincoln was equitably estopped from seeking that amount or terminating the policy. (*Id.*, Kunstlinger Opp'n Br. pp. 14–16.)

Lincoln contends that the central question is whether the policy lapsed in May 2021 and was no longer in force upon Stolper's death in May 2022. (ECF No. 33–1 (Lincoln Mot. Br.) p. 10.) It asserts that the policy complied with the New Jersey Administrative Code's grace requirements. (*Id.* pp. 11, 12.)

7

Citing *Spalter v. Protective Life Insurance*, Case No. 22–3344, 2024 WL 658975 (3d Cir. Feb. 16, 2024), Lincoln claims that there is no New Jersey law governing lapse notices and thus its only obligations after the policy entered grace were contractual—to provide notice at least 30 days prior to lapse and keep the policy in force until May 15, 2021. (*Id.* pp. 13–16.) Those obligations were met. (*Id.* pp. 14–16.) Though the Trust made two payments of $19,996.50 after the March 15, 2021 notice, the sums were insufficient to bring the policy out of grace. (*Id.* pp. 16, 17.) Because the policy terminated without reinstatement, no death benefit was payable upon Stolper's death. (*Id.* p. 18.)

Kunstlinger's explanations fail as a matter of law, according to Lincoln. (*Id.* pp. 18–27, Lincoln Opp'n Br. pp. 6–31.) Again citing *Spalter*, Lincoln argues that its notice obligations arose entirely out of contract and those obligations were met. (Lincoln Mot. Br. pp. 19–21, Lincoln Opp'n Br. pp. 22–27.) Lincoln notes that the statutes cited in Kunstlinger's briefing relate to automobile policies and the out-of-district cases rely on inapplicable state statutes. (Lincoln Opp'n Br. pp. 22, 23.) The notion that there was a "correct" sum to include in the grace notice misunderstands the fluctuating values of universal life policies, according to Lincoln, and the March 15, 2021 notice sought the sum necessary to cover the net surrender shortfall and keep the policy in force for three months, consistent with industry standards. (*Id.* pp. 27–30, Lincoln Mot. Br. pp. 22, 23.) Kunstlinger's claim that the March 15, 2021 notice sum was incorrect is further undermined by the amount never being questioned until after Stolper's death, according to Lincoln. (Lincoln Mot. Br. p. 24.)

Likewise, with respect to Kunstlinger's equitable estoppel argument, Lincoln's representative stated during the February 8, 2021 call that the policy's surrender value was low and later sent an illustration advising that a $206,000 lump payment and increased premium payments were necessary.

(*Id.* pp. 25–27, Lincoln Opp'n Br. pp. 9, 10.) The Trust continued to pay the same $19,996.50 without seeking clarification and without reasonable reliance on the representative's purported misrepresentation. (Lincoln Mot. Br. p. 27, Lincoln Opp'n Br. pp. 10–18.) Lincoln asserts that Kunstlinger's argument is demonstrably false and it is thus entitled to summary judgment. (Lincoln Mot. Br. p. 27, Lincoln Opp'n Br. pp. 7–10.)

### III. DISCUSSION

#### A. The Validity of Notice

After reviewing the authorities cited by the parties and conducting independent research, I find that *Spalter* provides at least some guidance as to the validity of March 15, 2021 grace notice. The parties in *Spalter* cross-moved for summary judgment in district court. *Spalter v. Protective Life Ins. Co.*, Case No. 21–08843, 2022 WL 17250730, at *1 (D.N.J. Nov. 28, 2022). The policy, like the one here, included a 61-day grace period and the defendant mailed the relevant grace notice to the plaintiff on February 8, 2016, advising that premiums paid were insufficient to protect against lapse or keep cash value above zero. *Id.* at *1–2. The plaintiff called the defendant and was informed that a minimum payment of $16,034.14 paid by March 12, 2016 was necessary to take the certificate out of grace. *Id.* at *2. The plaintiff paid $15,425 two days before the deadline. *Id.* At summary judgment, the court concluded that the defendant provided adequate notice under the policy and that summary judgment in its favor was warranted. *Id.* at *4. Whether or not the plaintiff agreed with the purported amount due, "he painted himself into a corner" by waiting until just before the policy lapsed to make an insufficient payment rather than requesting an explanation from the defendant. *Id.*

The Third Circuit affirmed. *Spalter*, 2024 WL 658975, at *3. It rejected the plaintiff's argument that the defendant failed to meet its obligations because it did not "request the correct amount." *Id.* at *2. The policy required

9

written notification when the grace period had begun, an obligation satisfied by the February 8, 2016 notice.  *Id.*  The defendant was not required to state the amount owed.  *Id.*  Relevantly, the Third Circuit noted that "[t]here is no New Jersey law governing lapse notices."  *Id.* at *2 n. 4

Kunstlinger seeks to distinguish *Spalter*,[4] asserting that the plaintiff's challenge to the validity of the grace notice there was time-barred and asserting that the Third Circuit's decision supports his general position that an invalid notice voids a lapse.  (Kunstlinger Opp'n Br. p. 17, Kunstlinger Reply Br. p. 14.) Kunstlinger also argues that the plaintiff in *Spalter* did not receive a notice with a specific amount while, here, Lincoln sought an inflated sum contrary to the terms of the policy and out-of-district decisions.  (Kunstlinger Opp'n Br. pp. 18–21, Kunstlinger Reply Br. pp. 14–16.)  I find these arguments to be unavailing.

First, Kunstlinger ignores the fact that the Third Circuit addressed two distinct issues in *Spalter*—the sufficiency of notice and whether the plaintiff paid the true amount owed.  2024 WL 658975, at *2.  The Third Circuit found that the defendant met its obligations as to notice and concluded only that the plaintiff's argument that he paid the true amount owed was time-barred.  *Id.* What notice was required and the amount necessary to have prevented the policy from lapsing were distinct in *Spalter* and are distinct here.

Kunstlinger asserts that the grace notice was required to only seek the minimum sum necessary to keep the policy in force under both the terms of the policy and out-of-district decisions. (Kunstlinger Opp'n Br. pp. 19–21.) However, to the extent that the out-of-district decisions cited are on-point, they rely on state statutes inapplicable to the instant case.  *See e.g., Halberstam as Tr. of Zupnick Fam. Tr. 2008 B v. Allianz Life Ins. Co. of N. Am.*, 349 F. Supp.

---

[4] Lincoln notes that Kunstlinger's counsel represented the plaintiff in *Spalter*. (Lincoln Mot. Br. p. 22.)

3d 164, 170 (E.D.N.Y. 2018)[5]; *Turner v. OM Fin. Life Ins. Co.*, 822 F. Supp. 2d 633, 637–38 (W.D. La. 2011). *Spalter* supports the proposition that New Jersey does not have a statute or regulation governing grace notices and thus an insurer's notice obligations are based on the policy's terms. 2024 WL 658975, at *2, 2 n. 4. The policy's grace provision reads, in full,

> Except as provided in the Safety Net Premium provision below, if on any monthly activity day the net surrender value is less than the monthly deduction for the current certificate month, you will be given a grace period of 61 days. This certificate will be in force during the grace period. If you do not make sufficient payment by the end of the grace period, the certificate will lapse. If the insured dies during the grace period, we will deduct any due and unpaid monthly deductions and certificate debt owed from the death benefit.

---

[5] Kunstlinger submits that *Halberstam* is particularly on-point. (Kunstlinger Mot. Br. p. 13, Kunstlinger Opp'n Br. p. 20.) In *Halberstam*, the policy entered into grace, the defendant sought $116,511.94 in both the grace notice and a conversation with the plaintiff, the policy lapsed, and the plaintiff did not seek reinstatement. 349 F. Supp. 3d at 167–69. The plaintiff instead filed a complaint seeking a declaratory judgment that the policy was still in effect. *Id.* at 169. The district court recognized that under both New York law and the policy, a premium sufficient to keep the policy in force for three months was required prior to the end of the grace period. *Id.* at 169–70 (citing N.Y. Ins. Law § 3203(a)(1)). It further noted that, pursuant to N.Y. Ins. Law § 3211(b)(2), the grace notice was required to state the amount to be paid. *Id.* at 170. While the statute did not expressly require that the stated amount be correct, New York federal courts had predicted that the New York Court of Appeals would invalidate a notice that misstated the amount if the difference was not *de minimis*. *Id.* Because the defendant sought a sum that would have kept the policy in force for four months rather than three, the court held that the grace notice was invalid. *Id.* I find *Halberstam* to be unpersuasive as it relies on New York law, and interpretations thereof, that are inapplicable here. Of note, at the dismissal stage, the *Halberstam* defendant argued that the plaintiff's claim that the amount sought was incorrect would not be cognizable in the event that New Jersey law applied because there are no statutory notice requirements in New Jersey. *Halberstam, Tr. of Zupnick Fam. Tr. 2008 B v. Allianz Life Ins. Co. of N. Am.*, Case No. 16–06854, 2017 WL 10187689, at *7 n. 4 (E.D.N.Y. June 9, 2017). The court declined to reach the merits of this argument or decide whether New Jersey or New York applied at the dismissal stage and presumed that New York law applied. *Id.*

> We will send a written notice to the most recent address we have for you at least 30 days prior to the day coverage lapses.

(Policy p. 21.)

Further, New Jersey Administrative Code requires individual life insurance forms to include a grace provision. *See* N.J. Admin. Code 11:4–41.3(b)(2). For account value policies kept in force by the policy value exceeding zero, the grace period is to be at least 30 days following the date on which the policy value equals zero or at least "60 days following the first monthly deduction date for which the policy value is insufficient to provide an entire additional month of insurance." *Id.* (b)(2)(vi). I conclude that the policy satisfied those requirements. Lincoln was obligated under the policy to keep the policy in grace for 61 days during which it would remain in force and provide written notice at least 30 days prior to lapse. (Policy p. 21.) Those obligations were met here.

Kunstlinger keys in on the policy's "sufficient payment" language. (Kunstlinger Opp'n Br. pp. 18, 19, Kunstlinger Reply Br. pp. 12, 13.) However, this portion of the provision clearly refers to the policy holder's obligation to pay rather than the insurer's obligation to provide notice. Whether or not requiring insurers to state in grace notices the absolute minimum premium necessary to keep a policy in force—and adopting a related calculation—is sound policy, such an argument is better suited for the New Jersey Legislature. *See In re Peralta*, 48 F.4th 178, 181 (3d Cir. 2022) ("Only legislators, not courts, can craft policy."). The relevant inquiry is whether Lincoln met its obligations under the policy. I conclude that there is no genuine dispute that it did.

Second, Kunstlinger claims that, unlike this case, the notice in *Spalter* did not contain a minimum payment amount. (Kunstlinger Opp'n Br. p. 18, Kunstlinger Reply Br. pp. 14, 15.) This is not entirely accurate. While the notice did not contain a requested amount, it included a customer service

12

number and when the plaintiff called he was told that a payment of $16,034.14 was required to keep the policy in force. 2024 WL 658975, at *1. He instead paid $15,425. *Id.*

The parties' experts disagree on the sum that ought to have been requested in the March 15, 2021 grace notice. Lincoln's expert, Neil M. Sullivan, notes that New Jersey insurance law does not generally require notice of the grace period, let alone dictate what it must contain. (ECF No. 33–15 p. 13.) The $150,657.27 sum requested in the March 15, 2021 grace notice represented the surrender value shortfall plus the premium necessary to keep the policy in force for three months, consistent with industry custom and the policy's reinstatement provision, according to Sullivan. (*Id.* p. 14.)

Kunstlinger's expert, Rajiv Rebello, contends that the amount sought should have been the "amount necessary to keep the policy in force for two months from 3/15/2021 (the first monthly deduction date the policy went into grace) and 4/15/2021 (the second monthly deduction date that the policy went into grace)," $68,828. (ECF No. 32–5 (Rebello Expert Report) p. 2.)[6] Lincoln's director of operations – customer service, Connie Heinrich, similarly testified that a payment of about $70,000 would have kept the policy from terminating. (ECF No. 32–6 pp. 93:23 to 94:12.) Rebello further opines that the policy should not have entered grace on December 15, 2020 and that despite Lincoln requesting $116,841.94 in that notice, the $39,993 the Trust ultimately paid proved to be sufficient to keep the policy in force. (Rebello Expert Report p. 3.) This example is consistent with the proposition that the typical sufficient

---

[6] Lincoln notes that Rebello's figure only purports to be the amount sufficient to have kept the policy in force through May 14, 2021 and that another monthly deduction would have been assessed on May 15, 2021, the last day of the grace period. (Lincoln Opp'n Br. pp. 29, 30.) Lincoln's point is well taken. Ultimately, my decision rests on the notice requirements contained in the policy and the fact that the Trust did not remit even the $68,828 figure identified by Rebello.

payment for a policy with a 61-day grace period is the amount necessary to cover two monthly deductions, according to Rebello. (*Id.*)

"It is not this Court's role, on summary judgment, to declare a victor in the battle of the experts." *See Ho v. Goldman Sachs & Co. Grp. Long Term Disability Plan*, Case No. 13–06104, 2016 WL 8673067, at *14 (D.N.J. Oct. 28, 2016). However, I find the debate over the amount necessary to have kept the policy in force to be a red herring. This is because, as stated above, I conclude that Lincoln's notice obligations were limited to the language of the policy. Insofar as the experts' competing figures could inform whether the policy lapsed, there is no support for the proposition that the Trust paid even Rebello's $68,828 figure. Rather, following the March 15, 2021 notice, the Trust made payments of $19,996.50 on April 12, 2021 and May 13, 2021. (Premium History Log p. 2.)

In this respect, the facts of this case are distinguishable from *Spalter*, but not in a way that is helpful to Kunstlinger. While the plaintiff in *Spalter* asserted a time-barred argument that the amount sought was excessive and he had paid the amount necessary to have kept the policy in force, 2024 WL 658975, at *2, Kunstlinger can make no such claim. Indeed, he states in his supporting affidavit, that—based on his February 8, 2021 conversation with the Lincoln representative—when he received the March 15, 2021 notice and saw the demand of $150,657.27 he "thought nothing of it and continued to make the regular monthly payments of $19,996.50." (Kunstlinger Aff. p. 3.) Whether or not Kunstlinger disagreed with the amount sought, "he painted himself into a corner" by ignoring the grace notice and continuing with insufficient payments rather than contacting Lincoln for an adequate explanation. *See Spalter*, 2022 WL 17250730, at *4.

Finally, in opposition to Lincoln's motion, Kunstlinger contends that Rebello "determined that during the life of the Policy, Lincoln miscalculated the

Policy's surrender value. Therefore, there are serious questions as to Lincoln's calculations and whether the Policy in fact entered grace" on March 15, 2021. (Kunstlinger Opp'n Br. pp. 21, 22.) "Such speculation cannot stave off summary judgment; '[t]o the contrary, "summary judgment is essentially 'put up or shut up' time for the non-moving party" who "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."'" *Bock v. Novartis Pharms. Corp.*, 661 F. App'x 227, 233 (3d Cir. 2016) (alteration in original) (quoting *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 330 (3d Cir. 2016)). Rebello's report opines that the policy should not have entered grace on December 15, 2020, but on the relevant issue of the March 15, 2021 notice, even he acknowledges that the policy was in grace as evidenced by his finding that $68,828 was needed to keep the policy in force. (Rebello Expert Report pp. 2, 3.) Kunstlinger offers no support in the record that the policy did not enter grace on March 15, 2021 and such argument will not prevent summary judgment.

Because Lincoln's notice obligations were set by the policy rather than any statutory or regulatory requirement, such obligations were met by Lincoln, and there is no support in the record that the Trust paid sums sufficient to have kept the policy in force, summary judgment will be entered in favor of Lincoln.

### B. <u>Equitable Estoppel</u>

Kunstlinger's alternative argument is that Lincoln is equitably estopped from terminating the policy based on his February 8, 2021 phone conversation with a Lincoln representative. (Kunstlinger Mot. Br. pp. 14, 15, Kunstlinger Opp'n Br. pp. 13–16.) "Equitable estoppel applies when 'conduct, either express or implied, which reasonably misleads another to his prejudice so that a repudiation of such conduct would be unjust in the eyes of the law.'" *D'Agostino v. Maldonado*, 78 A.3d 527, 546 (N.J. 2013) (quotations omitted) (quoting *McDade v. Siazon*, 32 A.3d 1122, 1132 (N.J. 2011)). "Its elements are

15

'a knowing and intentional misrepresentation by the party sought to be estopped under circumstances in which the misrepresentation would probably induce reliance, and reliance by the party seeking estoppel to his or her detriment.'" *Id.* (quoting *O'Malley v. Dep't of Energy*, 537 A.2d 647, 651 (N.J. 1987)). "The burden of proof of a claim based on principles of equitable estoppel is clearly on the party asserting estoppel" and equitable estoppel "is applied only in very compelling circumstances ... 'where the interests of justice, morality and common fairness clearly dictate that course.'" *Hoelz v. Bowers*, 278 A.3d 797, 804 (N.J. Super. Ct. App. Div. 2022) (omission in original) (quoting *Miller v. Miller*, 478 A.2d 351, 355 (N.J. 1984) and *Davin, L.L.C. v. Daham*, 746 A.2d 1034, 1040 (N.J. Super. Ct. App. Div. 2000)).[7]

Kunstlinger asserts that during the February 8, 2021 call with a Lincoln representative he was informed that the policy was not in grace, not in danger of termination, and that "[i]n other words, Lincoln advised [Kunstlinger] that the $19,996.50 monthly premium payment—the amount that [Kunstlinger] has been paying all along—was sufficient in order to continue to keep the Policy in force." (Kunstlinger Mot. Br. p. 15, Kunstlinger Opp'n Br. pp. 14–16.) The Trust thereafter proceeded to make payments of $19,996.50 to its detriment. (Kunstlinger Mot. Br. p. 15, Kunstlinger Opp'n Br. p. 15.)

A review of the February 8, 2021 call transcript leads me to reject Kunstlinger's equitable estoppel argument for lack of misrepresentation. The Lincoln representative indeed informed Kunstlinger that the policy was not in grace and that he did not have to worry about termination. (Feb. 8, 2021 Call Tr. p. 5.) If the policy thereafter terminated 61 days after the December 15,

---

[7] Kunstlinger states in his brief that "courts have expanded the traditional notions of equitable estoppel in order to protect the reasonable expectation of the insured." (Kunstlinger Mot. Br. p. 14, Kunstlinger Opp'n Br. p. 15.) He supports this proposition by citing *UTI Corp. v. Fireman's Fund Insurance Co.*, 896 F. Supp. 362 (D.N.J. 1995). However, the cited portion of *UTI Corp.* refers to the Third Circuit's discussion of Pennsylvania law. 896 F Supp. at 371.

2020 grace notice, Kunstlinger's arguments may have held water. However, the transcript of the call contains none of the forward-looking assurances Kunstlinger presents in his brief.

Specifically, the representative explained that the surrender charge was why the policy was "tripped" and that, with Lincoln, "if the surrender value is at zero, even though you have a—an accumulated value, you would still have to heed that grace notice." (*Id.*) The representative further advised that the policy was not in grace "[a]s of right now" because Lincoln had subsequently received two payments, but that he would provide Kunstlinger with an illustration so that he could "know what that minimum premium would need to be to keep it active so that this doesn't happen again." (*Id.*) Even the assurance that Kunstlinger did not have to worry about termination was in response to Kunstlinger's question about whether he had to worry about termination "as of now." (*Id.*) Notably absent from the exchange is any instruction or advisement that continued payments of $19,996.50 would keep the policy in force. Whomever the "other words" Kunstlinger relied upon in continuing the $19,996.50 payments may be attributed to, (Kunstlinger Mot. Br. p. 15), they were not those of the representative.

Even if I were look past this fatal flaw in Kunstlinger's argument, and I do not, I would ultimately arrive at the inescapable conclusion that he was not reasonably misled. *See D'Agostino*, 78 A.3d at 546. First, Kunstlinger's affidavit asserts that a premium amount of $19,995.50 appears on the face of the policy. (Kunstlinger Aff. p. 2.) Without a pin citation to the policy itself, I presume that he is referring to the "Payment Information" section toward the front of the policy which states that "[t]he payment of a monthly Safety Net premium of $19,995.50, on or before each monthly activity day, is guaranteed to keep this certificate in force for 5 years, assuming no loans or withdrawals are taken." (Policy p. 6.) This provision could not support a belief that

17

monthly payments of $19,995.50, or $19,996.50, could keep the policy in force indefinitely. Further, monthly payments of $19,995.50 or $19,996.50 do not amount to the planned annual payment of $364,971 that appears on that same page of the policy. (*Id.*)

Kunstlinger also received subsequent information that would have corrected any misconception that he may have had. He specifically requested an illustration during his February 8, 2021 call with the Lincoln representative. (Feb. 8, 2021 Call Tr. pp. 4, 5.) That illustration showed that the net surrender value of the policy was $627.97 and recommended a lump payment of $206,000 and increased annual premiums of $721,269.26. (Feb. 9, 2021 Illustration pp. 4, 5.) Lincoln also issued subsequent grace notices on February 16, 2021 and March 15, 2021. (Feb. 16, 2021 Grace Notice, Mar. 15, 2021 Grace Notice.) Each advised that, if planned premiums were being submitted, they were insufficient in frequency or amount to keep the policy in force. (Feb. 16, 2021 Grace Notice p. 2, Mar. 15, 2021 Grace Notice p. 2.) If Kunstlinger was unaware of what was necessary to keep the policy in force following the February 8, 2021 call, it would have been reasonable after any of these subsequent correspondences to inquire further. *See McGuire v. Bd. of Trs., Pub. Emps.' Ret. Sys.*, Case No. A–0505–12T1, 2014 WL 7745772, at *8 (N.J. Super. Ct. App. Div. Feb. 5, 2015) (concluding that the appellant should have known that accrued interest had not been included when he received his first paycheck and that the error could have been rectified by an inquiry). Because I conclude that there was no underlying misrepresentation by Lincoln and Kunstlinger was not reasonably misled under both the terms of the policy and the subsequent illustration and grace notices, summary judgment will be entered in favor of Lincoln.

## IV. CONCLUSION

For the foregoing reasons, Kunstlinger's motion for summary judgment (ECF No. 32) will be DENIED and Lincoln's motion for summary judgment (ECF No. 33) will be GRANTED. An appropriate order accompanies this opinion.

                                             */s/ Edward S. Kiel*
                                             **EDWARD S. KIEL**
                                             **UNITED STATES DISTRICT JUDGE**

Dated: January 21, 2025